**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DELAWARE STATE UNIVERSITY STUDENT HOUSING FOUNDATION, a Delaware Corporation., | ) ) ) | |
| | ) | C.A. NO. 07-610 (JJF) |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMAND |
| AMBLING MANAGEMENT COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF AMBLING MANAGEMENT COMPANY

**COMES NOW,** Ambling Management Company ("AMC" or "Defendant"), Defendant in the above-captioned matter, and files this its Answer, Affirmative Defenses and Counterclaim to the Complaint (the "Complaint") of Delaware State University Student Housing Foundation (the "Foundation" or "Plaintiff") as follows. Without assuming the burden of proof where it otherwise lies upon Plaintiff, Defendant pleads the following defenses:

### FIRST DEFENSE

Defendant pleads the affirmative defense that Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Defendant pleads the affirmative defense that Plaintiff's Complaint fails to state a claim against AMC for declaratory judgment relief, and to the extent Plaintiff seeks declaratory judgment relief in this action any such purported claim should be dismissed.

## THIRD DEFENSE

Defendant pleads the affirmative defenses of waiver and estoppel.

## FOURTH DEFENSE

Defendant pleads the affirmative defenses of lack of consideration and failure of

consideration.

## FIFTH DEFENSE

Defendant pleads that Plaintiff was the first material breacher of the Management

Agreements by failing to meet certain obligations under thereunder.

## SIXTH DEFENSE

Some or all of the claims in the Plaintiff's Complaint are barred by the express language

of the Management Agreements.

## SEVENTH DEFENSE

Defendant pleads the defense of set-off.

## EIGHTH DEFENSE

Defendant pleads that AMC is not a stranger to the contracts or relationships it has

allegedly interfered with.

## NINTH DEFENSE

To the extent that Plaintiffs request equitable relief, Defendant pleads the affirmative

defenses of unclean hands.

## TENTH DEFENSE

Defendant pleads that it was never in default under the terms of the Management

Agreements.

## ELEVENTH DEFENSE

Defendants pleads that it timely repaired and addressed all issues regarding the subject properties of which it was given sufficient notice as required under the Management Agreements.

## ANSWER

As to the allegations in Plaintiff's Complaint, Defendant answers by denying that it is liable for the amounts claimed by Plaintiff, or any amounts whatsoever, and responds to the specifically enumerated paragraphs of the Complaint as follows:

### Nature of the Action

1.      Defendant admits that it was a party to Management Agreements (the "Management Agreements") with the Foundation and Delaware State University ("DSU") as sole member of the Foundation to manage, maintain and operate the Foundation's two properties, the University Courtyard Apartments (the "Courtyard") and the University Village (the "Village'). The Management Agreements are writings which speak for themselves. Defendant denies the allegations contained in Paragraph 1 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements. Defendant denies all remaining allegations contained in Paragraph 1 of the Complaint.

### The Parties

2.      Upon information and belief, Defendant admits allegations contained in Paragraph 2 of the Complaint.

3.      Defendant admits the allegations contained in Paragraph 3 of the Complaint.

4.      Defendant admits that the Federal District Court for the District of Delaware has jurisdiction over Defendant.

<u>The Contracts</u>

5.        Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of the Complaint, and for this reason denies the same.

6.        Defendant admits the allegations contained in Paragraph 6 of the Complaint.

7.        Defendant admits that the Foundation entered into an Amended and Restated Management Agreement with AMC on or about January 1, 2004, appointing AMC as an independent contractor to manage and lease the Courtyard property (the "Courtyard Agreement"). The Courtyard Agreement is a writing which speaks for itself.  Defendant denies the allegations contained in Paragraph 7 of the Complaint to the extent such allegations are inconsistent with the written terms of the Courtyard Agreement. Defendant denies all remaining allegations contained in Paragraph 7 of the Complaint.

8.        Defendant admits that the Foundation entered into an Amended and Restated Management Agreement with AMC on or about August 1, 2005, appointing AMC as an independent contractor to manage and lease the Village property (the "Village Agreement"). The Village Agreement is a writing which speaks for itself.  Defendant denies the allegations contained in Paragraph 8 of the Complaint to the extent such allegations are inconsistent with the written terms of the Village Agreement. Defendant denies all remaining allegations contained in Paragraph 8 of the Complaint.

9.        Denied. The Management Agreements are writings which speak for themselves. Defendant denies the allegations contained in Paragraph 9 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 9 of the Complaint.

10.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 10 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 10 of the Complaint.

11.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 11 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 11 of the Complaint.

12.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 12 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 12 of the Complaint.

13.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 13 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 13 of the Complaint.

14.     Defendant admits that it received management fees pursuant to the Management Agreements. Defendant denies all remaining allegations contained in Paragraph 14 of the Complaint.

15.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 15 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 15 of the Complaint.

16.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 16 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 16 of the Complaint.

17.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 17 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 17 of the Complaint.

18.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 18 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 18 of the Complaint.

<u>The Alleged Breach/Default</u>

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Denied.

29.    Denied.

30.    Denied.

31.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 31 of the Complaint, and for this reason denies the same.

32.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 32 of the Complaint, and for this reason denies the same.

33.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 33 of the Complaint, and for this reason denies the same.

34.    Denied.

35.     Denied.

36.    Defendant admits that it received a letter from Mr. Mohammadi dated August 17, 2007. Defendant denies all remaining allegations contained in Paragraph 36 of the Complaint.

37.    Defendant admits that it received a letter from Mr. Mohammadi dated August 17, 2007. Defendant denies all remaining allegations contained in Paragraph 37 of the Complaint.

38.    Defendant admits that it received a letter from Mr. Mohammadi dated August 17, 2007. Defendant denies all remaining allegations contained in Paragraph 38 of the Complaint.

39.    Defendant admits that it received a letter from Mr. Mohammadi dated August 17, 2007. Defendant denies all remaining allegations contained in Paragraph 39 of the Complaint.

40.    Defendant admits that it received a letter from Mr. Mohammadi dated August 17, 2007. Defendant denies all remaining allegations contained in Paragraph 40 of the Complaint.

41.     Denied.

42.     Defendant admits that William Barkwell wrote a letter dated August 22, 2007, which speaks for itself.  Defendant denies the allegations contained in Paragraph 42 of the Complaint.

43.     Defendant admits that it received a letter from Mr. Mohammadi dated August 31, 2007. Defendant denies all remaining allegations contained in Paragraph 43 of the Complaint.

44.     Defendants admit that Mr. Barkwell wrote the Foundation in a letter dated September 4, 2007.  Mr. Barkwell's letter is a writing and the terms thereof speak for themselves. Defendant denies all remaining allegations contained in Paragraph 44 of the Complaint.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 56 of the Complaint, and for this reason denies the same.

57.     Denied.

58.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 58 of the Complaint, and for this reason denies the same.

59.    Denied.

60.    Denied.

61.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 61 of the Complaint, and for this reason denies the same.

62.    The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 62 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 62 of the Complaint, and for this reason denies the same.

63.    Defendant admits it received a letter from Mr. Mohammadi dated September 12, 2007 wrongfully terminating the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 63 of the Complaint.

64.    Defendant admits it received a letter from Mr. Mohammadi dated September 12, 2007 wrongfully terminating the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 64 of the Complaint.

65.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 65 of the Complaint, and for this reason denies the same.

<u>Count I: Declaratory Judgment</u>

66.     Defendant incorporates by reference its responses to Paragraphs 1-65 of the Complaint as if fully stated herein.

67.      The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 67 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 67 of the Complaint.

68.     Denied.

69.     Denied. The Foundation has wrongfully terminated the Management Agreements.

70.     Denied.

<u>Count II: Breach of Contract</u>

71.      Defendant incorporates by reference its responses to Paragraphs 1-70 of the Complaint as  if fully stated herein.

72.     The Management Agreements are writings which speak for themselves.  Defendant denies the allegations contained in Paragraph 72 of the Complaint to the extent such allegations are inconsistent with the written terms of the Management Agreements.  Defendant denies all remaining allegations contained in Paragraph 72 of the Complaint.

73.     Denied.

74.     Denied.

<u>Count III: Tortious Interference with Business Relations</u>

75.      Defendant incorporates by reference its responses to Paragraphs 1-74 of the Complaint as  if fully stated herein.

76.     Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 76 of the Complaint, and for this reason denies the same.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Defendant denies any and all allegations contained in the Complaint to which it has not specifically responded to herein.

**WHEREFORE**, Defendant prays for the following relief:

(a)     that the all claims alleged in the Complaint against the Defendant be dismissed with prejudice;

(b)     trial by jury;

(c)     that all costs of this action be taxed to the Plaintiff; and

(d)     for such other and further relief as this Court deems just, equitable and proper.

## COUNTERCLAIM

**COMES NOW**, Ambling Management Company ("AMC") and, subject to and without waiving its above stated defenses and incorporating by reference paragraphs 1 - 80 of its Answer to the Complaint as if fully set forth herein, file this Counterclaim against Delaware State University Student Housing Foundation ("Foundation") pursuant to Federal Rule of Civil Procedure 13, and show the Court as follows:

## PARTIES, JURISDICTION AND VENUE

1.     AMC is a Georgia corporation having its principal office and place of business at 348 Enterprise Drive, Valdosta, Georgia 3160.

2.     Upon information and belief, the Foundation is a Delaware corporation with its principal office and place of business located at 1200 N. Dupont Highway, Dover, Delaware 19901.

3.     Jurisdiction and venue are proper in this Court as to the Foundation.

4.     This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332.

5.     Venue is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### THE MANAGEMENT AGREEMENTS

6.      Ambling Management Company is one of the nation's most successful and experienced property managers of student, affordable, conventional and military housing.

7.     On September 1, 2000, AMC entered into a Management Agreement with DSU Student Housing, LLC (the "Original Management Agreement") to manage and lease the University Courtyard Apartments located on the main campus of Delaware State University (the "University").

8.      On February 1, 2002, the Original Management Agreement was amended by the First Amendment to Management Agreement.

9.      The Original Management Agreement, as amended was assigned to the Foundation by an Assignment and Assumption of Assumed Agreements, Mortgage and Ground Lease dated March 1, 2002.

10.     On January 1, 2004, the Foundation and AMC entered into an Amended and Restated Management Agreement for the management and leasing of the University Courtyard Apartments (the "Courtyard Agreement").

11.     The term of the Courtyard Agreement was to expire on July 31, 2016.

12.     In the Summer of 2005, due to AMC's demonstrated ability to successfully manage student  housing for DSU, the Foundation asked AMC to take over management of University Village, another student housing facility then managed by the University.

13.     On August 1, 2005, the Foundation and AMC entered into a Management Agreement for the management and leasing of University Village (the "Village Agreement").

14.     The term of the Village Agreement was also to expire July 31, 2016.

15.     Pursuant to the Courtyard Agreement and the Village Agreement (collectively the "Management Agreements"), AMC was to provide all services reasonably necessary, proper, desirable and appropriate for the successful management and operation of the University Courtyard Apartments and the University Village (the "DSU Properties") in a "First Class Manner" as that term is defined by the Management Agreements.

16.     In accordance with its obligations under the Management Agreements, AMC did provide all services reasonably necessary, proper, desirable and appropriate for the successful management and operation of the DSU Properties in a First Class Manner.

17.     From the beginning of the relationship between AMC and the University until the beginning of 2007, AMC managed the DSU Properties without any major complaints from the University or the Foundation.

### THE FOUNDATION'S NEW PRESIDENT

18.     In Summer of 2006, Mr. Amir Mohammadi was hired by DSU as its Vice President of Student Affairs and the President of the Foundation.

19.     At the end of 2006, AMC's Property Manager for the DSU Properties resigned, and despite repeated requests from AMC, and the presentation of qualified candidates, Mr. Mohammadi refused to let AMC hire a new property manager to manage the DSU Properties.

20.     At the request of Mr. Mohammdi, AMC hired two University Employees to help manage the properties.

21.     These University employees neglected their duties and hindered AMC's ability to effectively manage the properties.

22.     In the Spring of 2007, Hugh Hodge, AMC's Vice President of Student Housing, was invited to meeting of the Foundation's Board of Directors (the "Board").

23.     At the Board meeting, Mr. Hodge was told that the Foundation intended to take the management of student housing at the University in a different direction and bring the management of the DSU Properties in-house.

24.     When Mr. Hodge questioned the Board about what issues the Foundation had with AMC's management and performance under the contract, no response was given.

25.     At that Board meeting, a vote was taken by the Board of Directors of the Foundation whereby the Board approved the Foundation taking over operations and management of the DSU Properties.

26.     As early as May 2007, representatives of the Foundation then began telling students and students' parents that the University was going to take over control and management of the DSU Properties for the Fall of 2007.

27.     Upon information and belief, the Foundation also began hiring contractors to prepare the units on the DSU Properties for re-leasing.

28.     Concerned that the Foundation intended to wrongfully terminate the Management Agreements, Bill Barkwell, President of AMC, sent a letter to Mr. Mohammadi dated June 26, 2007, wherein Mr. Barkwell advised that the Foundation could not terminate the Management Agreements without cause, notice of default and an opportunity to cure. A true and accurate copy of the June 26, 2007 letter is attached hereto as **Exhibit A**.

29.     The June 26, 2007 letter also informed Mr. Mohammadi that AMC was not in default under the Management Agreements, and that AMC had received no notice alleging any default.

30.     The June 26, 2007 letter then proposed the Foundation could buy out the remaining term of the agreements if it wished to terminate.

31.     In response, AMC received a letter from the Foundation's attorney accusing AMC of using "hostile tactics" and stating incorrectly that the Foundation had identified a list of breaches by AMC. A true and accurate copy of the June 28, 2007 response letter is attached hereto as **Exhibit B**.

32.     The Foundation's June 28, 2007 letter requested that AMC contact the Foundation's attorney to arrange a meeting to discuss the Management Agreement issues.

33.     During the entire month of July 2007, counsel for AMC repeatedly attempted to arrange a meeting between the Foundation and AMC, but was unable to set a meeting due to the Foundation's non-responsiveness.

**THE SCHEME**

34.     During July and August 2007, the Foundation engaged in a series of wrongful acts specifically aimed at terminating the Management Agreements before their stated termination dates, and causing AMC's employees to terminate their employment contracts with AMC, so that the University and the Foundation could assume AMC's role as property manager of the DSU properties in an effort to cut costs.

35.     Upon information and belief, the Foundation had decided to improperly and illegally terminate the Management Agreements with AMC, motivated by bad faith and the desire to cut costs at AMC's expense.

36.     In July, a critical period in which the DSU Properties are refurbished, representatives of the Foundation began interfering with AMC's ability to "turn" the units located in the DSU Properties in preparation for the beginning of Fall classes.

37.     This interference included, among other things, requiring AMC employees to attend mandatory training sessions for multiple hours during key times during the day and "turn" process, and requiring AMC employees to perform work unrelated to the DSU Properties.

38.     Representatives of the Foundation continued to tell students, students' parents and even AMC employees that the Foundation would be taking over management of the DSU Properties prior to giving notice of any alleged defaults to AMC.

39.     The Foundation's actions caused the property managers for each of the DSU Properties to resign during this critical period and terminate their employment contracts and employment relationships with AMC.

40.     The Foundation's comments also caused great consternation among AMC employees who feared their jobs were in jeopardy, and many AMC employees began searching for employment elsewhere.

41.     Several of AMC's employees resigned their positions due to the Foundation's wrongful and improper statements that the Foundation would be taking over management of the DSU properties.

42.     On July 30, 2007, counsel for AMC again attempted to arrange a meeting, and again reiterated that the Foundation had no right to terminate the agreements and that the Foundation had not provided notice to AMC of any as required under the Management Agreements.   A true and accurate copy of the July 30, 2007 letter is attached hereto as **Exhibit C**.

43.     In early August, during the early stages of the turn period, Mr. Mohammadi met with Deena Downey, a Regional Manager for AMC, and informed Ms. Downey that the Foundation would be conducting an inspection the next day.

44.     Ms. Downey requested that the Foundation give AMC 24-28 hours notice of any inspections.

45.     Mr. Downey's request was ignored by the Foundation.

46.     On August 20, 2007, AMC received a letter from Mr. Mohammadi dated August 17, 2007 which purported to give notice of a list of items that the Foundation considered instances of default, and attached pictures of the units in need of repair.  A true and accurate copy of the June 26, 2007 letter is attached hereto as **Exhibit D**.

47.     Many of the pictures were taken during a period when students were moving out of the units and before the units could be cleaned and repaired before the new students move in.

48.     To the extent the August 17, 2007 letter purported to list only certain "instances" or "examples" of alleged defaults, the letter failed to comply with the notice provisions of the Management Agreements in that it failed to put AMC on notice of any specific defaults other than those specifically stated in the letter.

49.     To the extent the August 17, 2007 letter purported to list only certain "instances" or "examples" of alleged defaults, the letter was defective as a notice of default as it failed to provide AMC with an ability to cure the alleged defaults.

50.     On August 22, 2007, AMC responded to Mr. Mohammadi's letter and informed him that AMC would make repairs to the units identified by the Foundation and that Herman Sikes, AMC's Director of Construction Services, who is certified in mold abatement, had met with the Foundation's consultant regarding the mold issues identified and had agreed on a remediation plan.  A true and accurate copy of the August 22, 2007 letter is attached hereto as **Exhibit E**.

51.     In an email dated August 22, 2007, AMC informed the Foundation and Mr. Mohammadi of the remediation plan agreed upon by Mr. Sikes and the Foundation's consultant to address the mold issue. A true and accurate copy of the August 22, 2007 email is attached hereto as **Exhibit F**.

52.     On August 23, 2007, after receiving no response from Mr. Mohammadi, AMC again followed up with Mr. Mohammadi via email asking for approval of the remediation plan. A true and accurate copy of the August 23, 2007 follow up email  is attached hereto as **Exhibit G**.

53.     In an effort to remedy the mold issues addressed in the Foundation's August 17, 2007 letter in a timely manner, AMC moved forward with the remediation plan after receiving no response or direction from Mr. Mohammadi or the Foundation.

54.    By letter dated September 4, 2007, AMC informed Mr. Mohammadi and the Foundation that all of the items of default identified in the Foundation's August 17, 2007 letter had been corrected, remedied or cured, with the exception of one broken window that had been ordered but not delivered yet.  A true and accurate copy of the September 4, 2007 letter is attached hereto as **Exhibit H**.

55.    At 11:10 a.m. on September 4, 2007, Mr. Mohammadi faxed a letter to AMC informing it of an inspection by the Foundation on September 5, 2007, and requested that AMC notify all residents of such inspection under the 24 hour notice requirement in the current leases. A true and accurate copy of this September 4, 2007 letter is attached hereto as **Exhibit I**.

56.    AMC responded immediately by letter sent via facsimile informing Mr. Mohammadi that due to the Foundation's late notice to AMC of the inspection, the 24 hour notice requirement could not be accomplished by the next day.  A true and accurate copy of this September 4, 2007 response letter is attached hereto as **Exhibit J**.

57.    This surprise inspection was to occur in the middle of the move-in inspections where residents identify issues upon move-in that AMC would then address.

58.    Issues identified during the students' move-in inspections are usually addressed within a week or two of the inspection.

59.    On September 5, 2007, Mr. Barkwell wrote a letter to Mr. Mohammadi and the Foundation putting them on notice that the Foundation was in breach of the Management Agreements. A true and accurate copy of the September 5, 2007 letter is attached hereto as **Exhibit K**.

60.    Section 2.7 of the Courtyard Agreement and the Village Agreement both provide:

 Each party shall cooperate fully in all matters relating to the management, leasing, operation,

Financing of the Premises . . . Owner and University shall promptly respond to all reasonable

requests by Manager for information or consultation necessary for the management, leasing and

operations of the Premises"

61.    Mr. Barkwell's September 5, 2007 letter identified several instances in which the

Foundation was in default under the Management Agreements, including:

      a.  Agitating residents, residents' parents and AMC's staff by telling them the
University was taking over management of the property;

      b.  Scheduling mandatory meetings for AMC's staff during the critical time when the
units are being turned to prepare for the incoming students;

      c.  Scheduling inspections after students had moved out, but before AMC could
repair the damages done by students;

      d.  Scheduling surprise inspections without giving AMC adequate time to comply
with the notice requirement in the students' leases;

      e.  Failing to cooperate in the hiring of a property manager after the AMC property
manager resigned in December 2006; and

      f.  Refusing to meet with AMC despite AMC's efforts to arrange a meeting for over
two months.

62.    The Foundation's actions prevented AMC from effectively managing the DSU

Properties.

### THE WRONGFUL TERMINATION

63.    On September 12, 2007, AMC received a letter from Mr. Mohammadi stating that the Foundation was exercising its right to terminate both agreements, effective immediately. A true and accurate copy of September 12, 2007 letter is attached hereto as **Exhibit L**.

64.    The September 12, 2007 letter did not allege that AMC had failed to cure the alleged defaults noticed in the August 17, 2007 letter.

65.    On or before September 12, 2007, no Event of Default had occurred, no notice of default had been sent to AMC that complied with notice provisions of the Management Agreements, AMC had not failed to cure any deficiencies or defaults alleged and noticed by the Foundation, and the Foundation did not have a right under the Management Agreements to terminate all management services with AMC.

66.    On or before September 12, 2007, the Foundation knew or should have known that an Event of Default had not occurred, that AMC had not failed to cure any deficiencies, and that the Foundation did not have the right to terminate the Management Agreements.

67.    The September 12, 2007 letter from the Foundation failed to comply with the notice provisions of the Management Agreements.

68.    On September 12, 2007, the Foundation unilaterally and improperly, without justification or cause, terminated the Management Agreements with AMC.

### COUNT I: BREACH OF CONTRACT

69.     AMC incorporates by reference its responses to Paragraphs 1-80 of the Complaint as well as all allegations in Paragraphs 1-68 of the Counterclaim as if fully stated herein.

70.     The Foundation had a contractual duty to AMC to allow it to continue to manage the DSU Properties until the expiration of the terms of the Management Agreements on July 31, 2016.

71.     At all times relevant to the underlying action, AMC performed all of its obligations under the Management Agreements and was not in default under any of their terms.

72.      The Management Agreements required the Foundation to cooperate with AMC in all matters related to the management, leasing, and operation of the property.

73.      The Foundation failed to fulfill this obligation, and through its actions hindered and interfered with AMC's ability to effectively manage the DSU Properties.

74.     As result of the Foundations actions, several employees of AMC resigned further hindering AMC's ability to effectively manage the DSU Properties.

75.     The Foundation improperly terminated the Management Agreements without justification in breach of its duty and obligations to AMC under the agreements.

76.     The Foundation breached its duty to AMC to act in good faith and engage in fair dealing when it unilaterally and improperly, without cause or justification, terminated the Management Agreements.

77.     As a result of the Foundation's breaches and wrongful termination of the Management Agreements, AMC has suffered damages in excess of $2.5 million dollars.

## COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

78.      AMC incorporates by reference its responses to Paragraphs 1-80 of the Complaint as well as all allegations in Paragraphs 1-78 of the Counterclaim as if fully stated herein.

79.      Upon information and belief, agents, servants and/or employees of the Foundation or University contacted employees of AMC with the intention of causing them to leave the

employment of AMC to prejudice the ability of AMC to properly and effectively administer its responsibilities and obligations under the Management Agreements.

80.    The Foundation also used other tactics as described hereinabove, to harass AMC employees and prevent them from effectively doing their jobs.

81.    AMC had a business relationship and an expectancy of a continued business relationship with its employees.

82.    The conduct of the Foundation was intentional, willful and calculated to cause damage to AMC's lawful business by causing AMC's to terminate their employment contracts and business relationship with AMC, thereby effectively hindering AMC's ability to effectively and properly administer its responsibilities and obligations under the Management Agreements.

83.    The conduct of the Foundation was perpetrated with malice and with the intentional, improper and unlawful purpose of causing damage and loss, without right or justifiable cause.

84.    The conduct of the Foundation in communicating with employees of was malicious, intentional, willful and calculated to cause damage to AMC's lawful business and ability to effectively and properly administer its responsibilities and obligations under the Management Agreements.

85.    As a result of the conduct and actions of the Foundation, several key employees resigned from AMC during a critical period in AMC's performance of its obligations under the Management Agreements, terminating their employment contracts with AMC.

86.    As a result of the conduct and actions of the Foundation, AMC has been damaged in an amount to be determined at trial.

**WHEREFORE**, AMC prays for the following relief:

(a)     an award of damages, including attorneys' fees and related costs, against the Foundation for breach of contract and tortious interference in an amount not less than $2.5 million;

(b)     for an award of punitive damages against the Foundation in an amount to be determined by the enlightened conscience of the jury to deter the Foundation from engaging in similar willful, wanton, malicious and tortious conduct in the future;

(c)     trial by jury;

(d)     that all costs of this action be taxed to the Foundation; and

(e)     for such other and further relief as this Court deems just, equitable and proper.

Respectfully submitted this 23rd day of October, 2007.

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
*A Professional Limited Liability Company*


By:    /s/  AnnaMartina Tyreus
        Gerard M. O'Rourke(DE #3265)
        Anna Martina Tyreus (DE # 4771)
        222 Delaware Avenue, 15th Floor
        Wilmington, DE 19801
        Main Number: (302) 252-4320
        Main Fax: (302) 252-4330
        gorourke@wcsr.com
        mtyreus@wcsr.com

        Robert R. Ambler, Jr. (GA #014462)
        John G. Perry (GA#141609)
        **WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
        One Atlantic Center, Suite 3500
        1201 West Peachtree Street
        Atlanta, Georgia 30309
        Phone: (404) 872-7000
        Fax: (404) 888-7490
        rambler@wcsr.com
        joperry@wcsr.com

        *Attorneys for Ambling Management Company*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2007, I electronically filed the foregoing Answer, Affirmative Defenses and Counterclaim with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

        Kathleen Furey McDonough
        Sarah E. DiLuzio
        Potter Anderson & Corroon, LLP
        1313 N. Market Street
        P.O. Box 951
        Wilmington, DE 19899-0951
        (302)984-6000

I hereby certify that on October 23, 2007, I caused the foregoing document to be served upon the following in the manner so indicated:

        **BY FIRST-CLASS MAIL**
        Kathleen Furey McDonough
        Sarah E. DiLuzio
        Potter Anderson & Corroon, LLP
        1313 N. Market Street
        P.O. Box 951
        Wilmington, DE 19899-0951
        (302) 984-6000

This 23rd day of October, 2007.

        /s/ AnnaMartina Tyreus
        Anna Martina Tyreus (DE # 4771)

# EXHIBIT A



June 26, 2007

**VIA FACSIMILE (302-857-6362),**
**U.S. MAIL AND FEDERAL EXPRESS**


Delaware State University Student Housing Foundation
c/o Delaware State University
1200 N. Dupont Highway
Dover, Delaware 19901
Attention: Amir Mohammidi, Vice President of Student Affairs and University Operations

        RE:    Amended and Restated Management Agreement dated January 1, 2004
              between Delaware State University Housing Foundation ("Owner") and
              Ambling Management Company ("AMC") (the "Agreement")

Dear Mr. Mohammidi:

      We have been advised by you that the Owner intends to provide AMC with a notice of termination of the Agreement effective July 1, 2007, and that the Owner has engaged contractors to prepare the units in the student housing facilities for re-lease.

      Please be advised that the Owner has no right to terminate the Agreement without cause; the Owner may only terminate the Agreement if an "Event of Default" (as defined in Section 7.2 of the Agreement) has occurred and notice (and in most instances, an opportunity to cure the default) has been provided to AMC. As of the date of this letter, AMC is not in default of the Agreement, nor has it received any notice alleging a default from the Owner or the University.

      AMC has every intention of fulfilling its obligations and enforcing its rights under the Agreement and expects the Owner to fulfill its obligations also. As you are aware, the term of the Agreement extends until July 31, 2016. If the Owner desires to terminate the Agreement without cause, then it can buy out the remaining term of the Agreement by paying to AMC the management fee it would have earned during the remainder of the Agreement.

      I hope this clears up any confusion you might have about the Owner's right to terminate the Agreement.

Sincerely,

William F. Barkwell
President

7000 Central Parkway, NE
Suite 1100
Atlanta, GA 30328
Tel: 678.320.3780
Fax: 770.804.0209
www.ambling.com

June 26, 2007
Page 2

cc:

      Delaware State University
      1200 N. Dupont Highway
      Dover, Delaware  19901
      Attention: Dr. Allen L. Sessoms, President

      Delaware State University
      1200 N. Dupont Highway
      Dover, Delaware  19901
      Attention: Mark Farley, Vice President of Human Resources & Legal Affairs

      Schmittinger and Rodriguez, P.A.
      414 South State Street
      Dover, Delaware  19901
      Attention:  Catherine T. Hickey, Esq.

      Potter Anderson & Corroon, LLP
      Hercules Plaza, 6th Floor
      1313 Market Street
      Wilmington, Delaware  19801
      Attention:  Charles S. McDowell

      ACA Financial Guaranty Corporation
      140 Broadway, 47th Floor
      New York, New York  10005
      Attention:  Surveillance

# EXHIBIT B

# White and Williams LLP



824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
Phone: 302.654.0424
Fax: 302.654.0245

Marc S. Casarino
Direct Dial: 302.467.4520
Direct Fax: 302.467.4550
casarinom@whiteandwilliams.com

June 28, 2007

**Via Facsimile to 770-804-0209 and Regular Mail**

Mr. William F. Barkwell
Ambling Management Company
7000 Central Parkway, NE
Suite 1100
Atlanta, Georgia 30328

RE:  Delaware State University Housing Foundation, Inc.

Dear Mr. Barkwell:

I am writing in response to your June 26, 2007 letter to Delaware State University Housing Foundation, Inc. (the "Foundation"). First, your assertions that the Foundation has engaged contractors to prepare housing units for leasing and intends to terminate its contract with Ambling Management Company ("AMC") effective July 1, 2007 are incorrect. The Foundation has identified for AMC a list of breaches of the parties' contract by AMC and has engaged in steady efforts to resolve those breaches in a manner beneficial to both parties.

In response, AMC has resorted to using hostile tactics to frustrate the Foundation's repeated efforts at collaboration with posturing. We are willing to meet to discuss these issues in the context of transition of management from AMC. If AMC wishes to discuss a resolution of the contract issues, please contact me to arrange a meeting on or before July 6, 2007. Absent an amicable resolution, the Foundation will exercise its rights of termination and other lawful remedies.

Very truly yours,

Marc S. Casarino
WHITE AND WILLIAMS LLP

cc:    Amir Mohammadi, President, Student Housing Foundation Board

# EXHIBIT C

LAW OFFICES
COLEMAN TALLEY LLP

LISA W. WANNAMAKER

7000 CENTRAL PARKWAY, N.E.
SUITE 1150
ATLANTA, GA 30328
TELEPHONE (770) 698-9556
FACSIMILE (770) 698-9729
WEBSITE WWW.COLEMANTALLEY.COM

ESTABLISHED 1937

VALDOSTA OFFICE

910 N. PATTERSON STREET
VALDOSTA, GEORGIA 31601
P. O. BOX 5437 (31603)
TELEPHONE (229) 242-7562
FACSIMILE (229) 333-0885

July 30, 2007

**VIA E-MAIL AND U.S. MAIL**

Mr. Marc S. Casarino
White and Williams LLP
824 N. Market Street, Suite 902
Wilmington, Delaware  19899-0709

RE:    Delaware State University Housing Foundation ("Owner") and Ambling
Management Company ("AMC")

Dear Marc:

As you are aware, I have repeatedly contacted you by telephone and by e-mail to arrange a meeting between our respective clients regarding AMC's management of University Village and University Courtyard (the "Properties"). To date, despite our offer to travel to Delaware and several suggested dates, your client has not yet agreed to meet with AMC. On July 19, 2007, we proposed a meeting on July 31, 2007, but I have received no response from you. I have also called you several times and asked you to return my call, but you have not done so.

I left you a detailed message early last week regarding certain actions taken by the Owner's representatives which have interfered with AMC's ability to efficiently and effectively turn the units for entering students and to otherwise manage the Properties. For example, Ron Williams, who represented himself as affiliated with the Owner, insisted that AMC employees who were essential to turn the units participate in meetings starting at 3:00 p.m. and ending at approximately 7:00 p.m. beginning July 11, 2007 through August 3, 2007. These meetings interfere with the staff's responsibilities to complete new leases, ready the units for occupancy, and answer telephone and in-person inquiries about the Properties. When questioned by Deena Downey about this attendance requirement, Mr. Williams said that it was optional. We have now learned that Mr. Williams has scheduled mandatory training from August 3, 2007 through August 17, 2007. Mr. Mohammadi has also repeatedly tried to require AMC's employees to perform work unrelated to the management of the Properties. In addition, because of statements made to AMC's staff and actions taken by the Owner's representatives at the Properties, the property manager has tendered her resignation, and AMC is concerned that the Owner has jeopardized AMC's relationship with some of its other employees.

Mr. Marc Casarino
July 30, 2007
Page Two

      AMC does not understand why the Owner is refusing to meet with its President and Senior Vice President of Student Housing, Bill Barkwell and Hugh Hodge, yet continues to interfere with AMC's management of the Properties and intimidate and interrogate AMC's employees.

      Both you and Mr. Mohammadi have alluded to defaults by AMC under the management agreements for the Properties. Despite AMC's requests for evidence that the Owner provided AMC with written notice of the defaults as required under the management agreements, no such written notice has been provided, because no such default exists. As the Owner is aware, AMC has performed all of its obligations under the management agreements and expects the Owner to honor its obligations also.

      I realize that your client, and not you, may be the reason that a meeting cannot be scheduled. However, I urge you to discuss with your client the serious nature of the actions they have taken in light of the Owner's contractual commitment to AMC. I also request that you advise them not to interfere with AMC's relationships with its employees and to cease all actions which are frustrating AMC's ability to manage the Properties.

                Sincerely,

                Lisa W. Wannamaker

cc:    William F. Barkwell
       Hugh Hodge

# EXHIBIT D



# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT FOR BUSINESS AND FINANCE

August 17, 2007

Mr. William Barkwell
President
The Ambling Companies
348 Enterprise Drive
Valdosta, Georgia 31601

Dear Mr. Barkwell:

Pursuant to Section 8.1 "Notices" of the Ambling Management Agreements that are currently enforce between Ambling Management and the Delaware State University Housing Foundation, we hereby put you on notice that your company is currently in default of the agreement, as defined by Section 7.2(h).

Section 2.2, "Management Duties and Authority," states in part, that the "Manager shall provide all services reasonably necessary, proper, desirable or appropriate for the successful management and operation of the Premises in a First Class Manner, including the duties and services specified in this Agreement." First Class is defined in Section 1.1, as:

> "… in a sound, economical and prudent first class manner, standard or condition (as applicable) for the type, style, class, age and location (including submarkets) of the Premises consistent with the Annual Budget, in a manner intended to maximize Cash Flow. . First Class Manner, to the extent consistent with the Annual Budget, shall include keeping the Premises in good condition and repair, free of dirt, rubbish, snow, ice, graffiti and unlawful obstructions, and in compliance with all applicable legal requirements."

We have found several instances of default, which are in complete conflict with Section 2.2. These include, but are certainly not limited to:

1. Generally uninhabitable rental units
   - See attached pictures of rooms 616, 618, 628
2. Damaged and non functioning appliances
   - See attached pictures inside and outside of room 233, 426, 438, 618, 645
3. Damaged or non functioning toilets, sinks, etc.
   - See attached pictures inside rooms 421, 438
4. Damaged drywall
   - See attached pictures inside rooms 233, 435, 438,
5. Damaged and fetid carpets
   - See attached pictures inside rooms 418, 438
6. Damaged and/or missing door jambs
   - See attached pictures inside rooms 426, 434, 628,
7. Unchanged A/C and heating air filters
   - See attached pictures inside rooms 238, 418, 428, 435, 437

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

– 2 –                                                                August 17, 2007

8. Mold on walls and floors in several units
   - See attached pictures inside rooms 225, 226, 418, 421, 423, 426, 428, 438, 614
9. Infant living in at least one unit despite repeated prior notices
   - See attached pictures inside rooms 236, 411
10. Other safety issues
    - See attached pictures inside and outside rooms 128, 218
11. We have received no maintenance plan as required by contract

Moreover, Section 3.1(g) states that the manager shall not permit or commit waste of the premises. It seems clear from the examples of above that you are also in default of section 3.1(g) as well. We are equally if not doubly concerned about the health and safety of our students.

As mentioned in my letter of August 10, 2007, your company was notified about non functioning smoke detectors and panic buttons in many of the rental units (see attached pictures 215, 216, 217).. To date, some of these detectors and panic buttons are still in non functioning condition. There are many entrance doors with damaged locks (see pictures. 414, 438).

Lastly, your company is in default of Article IV of the agreement in that you have failed to adequately carry out your leasing duties and authority as defined by the agreement. We have found several instances of the following:

1. Unauthorized guests/visitors living in the units
2. Pets living in the units and in some cases being walked daily
3. Crimes being committed by unauthorized visitors
4. Children, including infants, living in the units
5. Waivers being issued for uninhabitable units

We fully expect that you will make every attempt to remedy the above defaults. As you are aware, Section 7.2(b) gives your company 15 days to remedy the defaults.

Sincerely,

Amir Mohammadi

President

Delaware State University Housing Foundation

Cc:     Housing Foundation Board Members

        Ambling Management: Village and Courtyard

# EXHIBIT E

AUG-22-2007 13:41 FROM:AMBLING MANAGEMENT    6785203050    TO:3028576202    P.001/001



August 22, 2007

Amir Mohammadi
President
Delaware State University Housing Foundation
Delaware State University
Office of the Vice President for Business and Finance
1200 N. Dupont Highway
Dover, DE 19901-2277

　　　　Re:　　Management Agreement

Dear Mr. Mohammadi:

　　　　I received your letter dated August 17, 2007, on August 20, 2007. In your letter your reference an August 10, 2007 letter that I have never received.

　　　　When you mentioned to Deena Downey last Thursday that your consultant had identified mold in nine units, Deena immediately contacted Herman Sikes. Herman is Ambling's Director of Construction, who has extensive experience and is certified in mold abatement is already assisting Deena with the unit turns. As Deena advised you in your meeting with her on Friday, Herman and four other maintenance personnel were on site on Monday, August 20. It is my understanding that Herman met with your consultant and they have agreed upon a remediation plan.

　　　　We are investigating the allegations made in your letter and will repair the items you have identified that need to be repaired. Depending on the date on which your representatives toured the properties, it may be that the items you identified were problems that would have been resolved in any event during the turn process.

　　　　As we have stated before on numerous occasions, it is Ambling's intent to honor all of its obligations under the management agreement.

　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　William F. Barkwell

Cc:　　Mr. Hugh Hodge
　　　　Ms. Deena Downey

7000 Central Parkway, NE
Suite 1100
Atlanta, GA 30328
Tel: 678.320.3780
Fax: 770.804.0209
www.ambling.com

# EXHIBIT F

From: Deena Downey
Sent: Wed 8/22/2007 3:25 PM
To: amohammidi@desu.edu
Subject:

Dear Amir,

Herman Sikes, Director of Construction Services for Ambling Management Company, has been on site since Monday August 13, 2007. He has evaluated the mold concerns in the apartments identified by your inspectors has provided the following observations and recommendations.

1- Of the nine (9) units listed I would class seven (7) as less than 10 square feet and two (2) as greater than 10 square feet.
2- Based on industry standard, a small isolated area of 10 sq. ft. or less can be conducted using General Clean Up Procedures.
3- The other two (2) units on the list are greater than 10 square feet but less than 30 square feet and it is recommend that a remediation company be used to conduct the clean up of these units.
4- There are also two additional units that we discovered on our walk through that are greater than 10 feet but less than 30 square feet that I recommend using a remediation company to conduct the clean up as well.

If we have your permission, we can move forward with the clean up of the apartments with less than 10 square feet immediately. We currently have staff on site to perform this process. Please advise us at your earliest convenience as we have students scheduled to move in these units as early as tomorrow.

In addition we are experiencing students regaining access to the apartments after being notify verbally and a letter sent to their local and permanent address not to enter. We are recommending that we change the locks on these apartments until the remediation process has been completed. Please let us know if you agree.

Thank you,


Deena Downey


This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or via email and delete this file from your mailbox.

2

# EXHIBIT G

-----Original Message-----
From:     Deena Downey
Sent:     Thursday, August 23, 2007 11:50 AM Eastern Standard Time
To:       amohammidi@desu.edu
Subject:          RE:

Amir,

I have left you a message regarding this situation. We are awaiting a response from you prior to us proceeding. I have my staff here ready to perform the repairs immediately, however without your response I can not move forward. Please call me at your earliest convenience so I can instruct my staff on what to do.

In addition this is delaying the residents in moving back into these apartments as well as the new student that have not taken possession due to the repairs not completed.

Deena

_____

From: Deena Downey
Sent: Wed 8/22/2007 3:25 PM
To: amohammidi@desu.edu
Subject:

Dear Amir,

1

Herman Sikes, Director of Construction Services for Ambling Management Company, has been on site since Monday August 13, 2007. He has evaluated the mold concerns in the apartments identified by your inspectors has provided the following observations and recommendations.

1- Of the nine (9) units listed I would class seven (7) as less than 10 square feet and two (2) as greater than 10 square feet.
2- Based on industry standard, a small isolated area of 10 sq. ft. or less can be conducted using General Clean Up Procedures.
3- The other two (2) units on the list are greater than 10 square feet but less than 30 square feet and it is recommend that a remediation company be used to conduct the clean up of these units.
4- There are also two additional units that we discovered on our walk through that are greater than 10 feet but less than 30 square feet that I recommend using a remediation company to conduct the clean up as well.

If we have your permission, we can move forward with the clean up of the apartments with less than 10 square feet immediately. We currently have staff on site to perform this process. Please advise us at your earliest convenience as we have students scheduled to move in these units as early as tomorrow.

In addition we are experiencing students regaining access to the apartments after being notify verbally and a letter sent to their local and permanent address not to enter. We are recommending that we change the locks on these apartments until the remediation process has been completed. Please let us know if you agree.

Thank you,


Deena Downey


This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or via email and delete this file from your mailbox.

# EXHIBIT H

**AMBLING**®
**MANAGEMENT**
**COMPANY**

September 4, 2007

VIA FACSIMILIE (302)857-6202
VIA FEDERAL EXPRESS -Hardcopy

Mr. Amir Mohammadi
President
Student Housing Foundation
Delaware State University Housing Foundation
1200 N. Dupont Highway
Dover, DE  19901-2277

RE:  Amended and Restated Management Agreement dated January 1, 2004 between
     Delaware State University Housing Foundation ("Owner") and Ambling
     Management Company ("AMC") (the "Agreement")

Dear Mr. Mohammadi:

Please be advised that all items which you identified as defaults in your letter of August
17, 2007, have been corrected, remedied and cured by AMC, except for the replacement
of one broken window, which is available only on a special order basis.  This window has
been ordered but has not yet been delivered.  It will be installed as soon as we receive it.

Sincerely,

William F. Barkwell
President

7000 Central Parkway, NE
Suite 1100
Atlanta, GA 30328
Tel: 678.320.3780
Fax: 770.804.0209
www.ambling.com

# EXHIBIT I

Case 1:07-cv-00016-MPT    Document 6-2    Filed 10/23/2007    Page 23 of 31



# DELAWARE STATE UNIVERSITY

### OFFICE OF FINANCE & ADMINISTRATION

September 4, 2007

**VIA FASCIMILE**
Hardcopy to Follow

Mr. William Barkwell
President
The Ambling Companies
348 Enterprise Drive
Valdosta, GA 31601

Re:   Notice of Inspection – Wednesday September 5, 2007

Dear Mr. Barkwell

Please take notice that the Delaware State University Housing Foundation intends to inspect our facilities at both the Village and Courtyard complexes on Wednesday September 5, 2007. Please ensure that you notify the residents of each complex in compliance with the twenty-four (24) hour notice provision as governed by the current lease. We fully expect that Ambling Management will cooperate with the inspection. If you have any questions, please contact me immediately.

Sincerely,

Amir Mohammadi
President
Student Housing Foundation

cc:    Housing Foundation Board
       Ambling Management – Village/Courtyard Management

# EXHIBIT J



September 4, 2007


<u>VIA FASCIMILE</u>

Mr. Amir Mohammadi
President
Student Housing Foundation
Delaware State University Housing Foundation
1200 N. Dupont Highway
Dover, DE  19901-2277

Dear Mr. Mohammadi:

As of 11:10 AM, I am in receipt of your notice of intention to inspect both communities, (Village and Courtyard complexes), tomorrow, September 5th.

As you stated in your letter today, we must provide all residents with 24 hours notice and in order to do so requires posting of notices on each unit door.  Since we are already into the middle of the day the day before inspection, we cannot physically properly notice all residents 24 hours in advance.

Our on-site staff is also in the middle of working through the move-in inspection reports for the residents in order to satisfy all resident issues noted upon move-in.

Due to the above issues, I would respectively request a delay in your inspections until next week.  Otherwise, we cannot provide proper notice of inspection to our residents and you will most likely identify other issues that are already being addressed as a part of the move-in function.

If you are in agreement with the above request please contact Hugh Hodge at (678) 338-3252 to coordinate an alternate inspection date.

Sincerely,

William F. Barkwell
President


7000 Central Parkway, NE
Suite 1100
Atlanta, GA 30328
Tel: 678.320.3780
Fax: 770.804.0209
www.ambling.com

# EXHIBIT K



September 5, 2007

VIA FACSIMILE (302-857-6202)
OVERNIGHT COURIER-HARDCOPY

Mr. Amir Mohammadi
Delaware State University Student Housing Foundation
c/o Delaware State University
1200 N. Dupont Highway
Dover, Delaware 19901

RE: Default by Delaware State University Student Housing Foundation ("Owner")
under Amended and Restated Management Agreement between Owner and
Ambling Management Company ("Ambling") dated January 1, 2004 (the
"Agreement")

Dear Mr. Mohammadi:

Section 2.7 of the Agreement, entitled "Cooperation," provides that "Each party shall cooperate fully in all matters related to the management, leasing, operation... of the Premises.... Owner and University shall promptly respond to all reasonable requests by Manager for information or consultation necessary for the management, leasing, or operation of the Premises."

The Owner is hereby notified of its failure to cooperate with Ambling in matters related to the management, leasing, and operation of the property. The Owner agitated the residents, the residents' parents, and Ambling's staff by repeatedly telling them that the University would take over management of the property on August 1, 2007, when it had no contractual right to do so. The Owner scheduled mandatory meetings with Ambling's staff during critical times when the staff was turning the units for fall occupancy. The Owner intimidated Ambling employees, causing two of the employees to terminate their employment with Ambling, which termination significantly hindered Ambling's ability to efficiently and effectively turn the units and manage the property. The Owner scheduled inspections after move out but before Ambling had an opportunity to correct damage caused by the students, and then used the results of this inspection to allege defaults by Ambling under the Agreement, even though these issues would have been resolved during the turn process without the Owner's interference. Lastly, the Owner, in an attempt to undermine Ambling's ability to effective manage the property and communicate with students, sent a letter advising Ambling of an inspection of the property tomorrow, knowing that Ambling was completing the move-in process for residents and giving Ambling insufficient time to send the notice of such inspection to residents as required by the lease.

The Owner has also not cooperated in the hiring of a property manager for the property. Ambling did not hire a property manager when Kim Moss resigned in December 2006, but

7000 Central Parkw.
Suite 1100
Atlanta, GA 30328
Tel: 678.320.3780
Fax: 770.804.0209
www.ambling.com

instead honored your request that we use two University employees. One of these employees was placed on Ambling's payroll; the other worked for one month as a subcontractor before resigning her position because of illness. When Ambling located a qualified property manager in late February, you requested that we not hire him, and we once again honored your request. We determined that a property manager was essential to the successful operation of the property, and found another qualified candidate in April, but you again asked us not to hire her in order for you to save money. Because the property needed a manager, Ambling hired Keira Potter. Ms. Potter resigned in August because of comments that you and your staff made. Please be advised that we intend to offer a qualified candidate the property manager position so that we can effectively manage the property.

We have tried for more than two months to set up a face to face meeting with you, but all of our attempts to do so have been frustrated by your or your lawyer's failure to respond to our requests. Our lawyer has written, e-mailed, and left messages for Mark Casarino, who represented himself as your attorney, but he has not responded to her. Instead, you and your staff have demanded meetings on little or no notice with Deena Downey and our other employees in an effort to undermine their ability to lease, manage and maintain the property.

You have mentioned several times to Ambling's staff that your first concern is for the security and comfort of the students who reside in the Village and the Courtyard; however, your actions over the past few months are in direct conflict with this stated concern. Your failure to cooperate with Ambling and to meet with Ambling to address its concerns is a direct breach of the Agreement, and has frustrated Ambling's ability to perform its obligations under the Agreement. You are hereby advised that your actions are preventing Ambling from effectively managing the property.

Ambling hereby requests that you comply with Section 2.7 of the Agreement. If you do not do so, I will authorize our legal counsel to take all necessary and appropriate action against the Owner, which may include the filing of a lawsuit for damages under the Agreement and an injunction to prohibit you and your staff from interfering with the performance of Ambling's obligations under the Agreement. Please contact me immediately to set up a face to face meeting between the Owner and Ambling. As we have repeatedly indicated, we are willing to travel to Dover to meet with you, but ask that you give us at least 7 days notice of a meeting date so that we can schedule economical flights.

The foregoing being said, we sincerely trust that we can resolve our differences through open and direct communication, and put aside the legal posturing, which does not positively serve the students nor the communities. We would like to re-establish the good relationship that Ambling and the Foundation have always enjoyed.

Sincerely,

William F. Barkwell
President

cc:    Delaware State University
1200 N. Dupont Highway
Dover, Delaware  19901
Attention:  Dr. Allen L. Sessoms, President

Schmittinger and Rodriquez, P.A.
414 South State Street
Dover, Delaware  19901
Attention:  Catherine T. Hickey, Esquire

Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 Market Street
Wilmington, Delaware 19801
Attention:  Charles S. McDowell, Esquire

ACA Financial Guaranty Corporation
140 Broadway, 47th Floor
New York, New York  10005
Attention: Surveillance

Hugh Hodge
Senior Vice President – Student Housing
Ambling Management Company

# EXHIBIT L



# DELAWARE STATE UNIVERSITY

### OFFICE OF FINANCE & ADMINISTRATION

September 12, 2007

<u>Via Facsimile and First Class Mail</u>

Mr. William F. Barkwell
President
Ambling Management Company
7000 Central Parkway, NE
Suite 100
Atlanta, GA 30328

Dear Mr. Barkwell:

Please be advised that, pursuant to Article VII, Section 7.2(h) of both the Amended and Restated Management Agreement dated January 1, 2004, and the Management Agreement dated August 1, 2005 (the "Management Agreements"), Delaware State University Student Housing Foundation (the "Foundation") hereby exercises its right to terminate both Agreements, effective immediately, based upon Ambling Management Company's default of its obligations under both Agreements.

As always, the Foundation's primary concern is for the safety and security of the Delaware State University students who are housed in the facilities managed by Ambling Management Company ("Ambling"). To assure a successful transition from Ambling's management of the Courtyard and Village facilities, the Foundation suggests that Ambling be prepared to turn over operation of these facilities no later than September 21, 2007.

We regret that Ambling's failure to manage the Courtyard and Village facilities in the First Class Manner required by the Management Agreements has led the Foundation to take this action.

Very truly yours,

Amir Mohammadi
President
Delaware State University Student Housing
Foundation

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6200 • FAX (302) 857-6202