IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DELAWARE STATE UNIVERSITY STUDENT HOUSING FOUNDATION, a Delaware corporation, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | C. A. No. 07-610-MPT |
| AMBLING MANAGEMENT COMPANY, | : : : | |
| Defendant. | : | |

**MEMORANDUM ORDER**

**I.     INTRODUCTION**

On September 13, 2007, Delaware State University Student Housing foundation ("the Foundation"),[1] filed suit against Ambling Management Company ("Ambling")[2] in the Superior Court of the State of Delaware in Kent County, seeking a declaratory judgment (Count I), and damages for breach of contract (Count II) and tortious interference with business relations (Count III). On October 5, 2007 Ambling removed the action to this court on the basis of the parties' diversity of citizenship.[3] On October 23, 2007, Ambling filed an Answer and Counterclaim.[4] On the same day Ambling filed a motion to dismiss Counts I and III of Foundation's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[5]

---

[1] The Foundation is a Delaware corporation with its principal place of business in Delaware. D.I. 8, Ex. 1, ¶ 2 ("Complaint") (hereinafter cited as "Compl., ¶ __").
[2] Ambling is a Georgia corporation with its principal place of business in Georgia. Compl., ¶ 3.
[3] D.I. 1.
[4] D.I. 6.
[5] D.I. 4 (Defendant Ambling Management Company's Motion to Dismiss Count I and Count III of Plaintiff's Complaint). Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to the jurisdiction of United States Magistrate Judge Mary Pat Thynge to "conduct any and all proceedings in this case including the trial, order and entry of final judgment, and conduct all post-judgment proceeding[s]."

A motion to dismiss is governed by Fed. R. Civ. P. 12(b)(6).[6] Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted.[7] The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve dispute facts or decide the merits of the case.[8] To survive a motion to dismiss under Rule 12(b)(6), the factual allegations must be sufficient to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact.[9] A plaintiff is obliged "to provide the 'grounds' of his 'entitle[ment] to relief' beyond labels and conclusions."[10] The court assumes that all factual allegations in a plaintiff's complaint are true and draws all reasonable factual inferences in the light most favorable to that plaintiff.[11] The court, however, should reject unsupported allegations, "bald assertions," or "legal conclusions."[12] When a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.[13]

## II. BACKGROUND[14]

The Foundation is the leasehold owner of two properties, the University Courtyard Apartments (the "Courtyard") and the University Village (the "Village")

---

See D.I. 19.
[6] See *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409-10 (3d Cir. 1991) (citing *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir. 1989) ("The threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand Rule 12(b)(6) motion.")).
[7] Fed. R. Civ. P. 12(b)(6).
[8] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).
[9] *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955, 1965 (2007).
[10] *Id.*
[11] *Morse v. Lower Marion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).
[12] *Id.* (citations omitted).
[13] *Bell Atlantic Corporation*, 127 S. Ct. at 1969.
[14] The recitation of facts in this section are taken from the Complaint and are not findings of the court.

(collectively, the "Apartments"), located on the main campus of Delaware State University ("DSU") in Dover, Delaware.[15] On January 1, 2004, the Foundation entered into a management agreement with Ambling whereby Ambling was appointed as an independent contractor to manage and lease the Courtyard Apartments (the "Courtyard Agreement").[16] On August 1, 2005, the Foundation entered into a second management agreement with Ambling whereby Ambling was appointed as an independent contractor to manage and lease the Village Apartments (the "Village Agreement") (collectively with the Courtyard Agreement, the "Management Agreements" or "Agreements").[17]

The Management Agreements are nearly identical in all relevant parts. Each provides that "[Ambling] shall provide all services reasonably necessary, proper, . . . desirable or appropriate for the successful management and operation of the Premises in [a] First Class Manner."[18] The Management Agreements define "First Class Manner" to mean "keeping the Premises in good condition and repair, free of dirt, rubbish, snow, ice, graffiti and unlawful obstructions, and in compliance with all applicable legal requirements."[19] Under the Agreements, Ambling was specifically required to:

> [O]ffer space in the Premises and use its best efforts to cause the space in the Premises to be fully leased . . . to Tenants which are Eligible Tenants who are Creditworthy on the best terms available for [the Foundation], acting in the best interest of [the Foundation][20]
>
> Prepare and . . . execute on behalf of [the Foundation] all Contracts for water, sanitary and storm sewer, drainage, electricity, steam, gas,

---

[15] Compl., ¶ 5.
[16] Compl., ¶ 7.
[17] Compl., ¶ 8.
[18] Compl., ¶ 9 (quoting *id*, Ex.1, Ex. A (Courtyard Agreement) and Ex. B (Village Agreement), § 2.2).
[19] Compl., ¶ 10 (quoting *id*, Ex.1, Ex. A and Ex. B, § 1.1).
[20] Compl., ¶ 11 (quoting *id*, Ex. 1, Ex. A and Ex. B, § 2.3).

> telephone, fuel, cleaning, garbage removal, pest control, Internet access, cable television, Premises security and other utilities and services necessary or appropriate for the management and operation of the Premises in accordance with the Annual Budget . . . .[21]
>
> Purchase all supplies and equipment necessary or appropriate for the management and operation of the Premises in accordance with the Annual Budget . . . .[22]
>
> [C]onsult with, and make recommendations to, [the Foundation] concerning the condition of the Premises and the necessity for maintenance, repair, alteration or Restoration thereof including the preparation of an annual schedule for maintenance and repair; contract for all work, labor and services necessary or appropriate to maintain and repair the Premises . . . promptly notify [the Foundation] upon learning that the condition of the Premises materially fails to meet any standard of maintenance and repair required under any Contract, Legal Requirement or Insurance Requirement . . . .[23]

The Agreements also provide that Ambling "shall not commit or permit waste of the Premises."[24] Ambling was to ensure that each tenant of the Apartments: signs a written lease; abides by the terms of that lease; and that the tenants do not violate their lease by, for example, permitting unauthorized people to live in the Apartments or having pets.[25]

Each of the Management Agreements had a July 31, 2016 expiration date.[26] The Foundation, however, had a right to terminate the Agreements if any one or more "Events of Default" occurred and was continuing.[27] The Agreements recite several Events of Default, including "gross negligence, willful misconduct, fraud, malfeasance or

---

[21] *Id.* (quoting *id*, Ex. 1, Ex. A and Ex. B, § 3.1(a)(ii)).
[22] *Id.* (quoting *id*, Ex. 1, Ex. A and Ex. B, § 3.1(a)(iii)).
[23] *Id.* (quoting *id*, Ex. 1, Ex. A and Ex. B, § 3.1(a)(iv)).
[24] Compl., ¶ 12 (quoting *id*, Ex. 1, Ex. A and Ex. B, § 3.1(g)).
[25] Compl., ¶ 13 (quoting *id*, Ex. 1, Ex. A and Ex. B, § 3.3; Article IV).
[26] Compl., ¶ 15 (citing *id*, Ex. 1, Ex. A and Ex. B, § 7.1).
[27] *Id.* (citing *id*, Ex. 1, Ex. A and Ex. B, § 7.2).

breach of fiduciary duty"; "fail[ure] to follow any reasonable written direction of [the Foundation] with respect to the Premises"; and/or "fail[ure] to comply with any provision of th[e] Agreement[s]."[28] If an Event of Default arose, Ambling was to be provided with written notice and a fifteen-day cure period.[29] Failure to cure the defaults within the requisite period permitted the Foundation to terminate the Agreements.[30]

At some period of time during 2007, the Foundation became aware of problems with Ambling's management of the Apartments; advised Ambling of its dissatisfaction with its performance (both orally and in writing); identified specific problems to Ambling; and attempted to work towards resolution of those problems.[31] In early August 2007, DSU facilities personnel conducted inspections of the Apartments in connection with the budgeting process for an anticipated capital campaign. During those inspections, it was discovered that: many safety and security devices were inoperable; several doors were damaged such that they did not properly or securely close; and that several units had unclean air vents.[32] On August 10, 2007, Foundation President Amir Mohammadi wrote a letter to the President of Ambling, William Blackwell, listing the problems discovered during the inspections and notifying Ambling of its obligation to rectify those problems. Mohammadi's letter also advised Ambling that its recent practice of obtaining waivers from students allowing them to move into unsafe and unsanitary units was unacceptable and that Ambling must cease the practice.[33]

---

[28] Compl., ¶ 16 (quoting id, Ex. 1, Ex. A and Ex. B, §§ 7.2 (c)(, (e), (h)).
[29] Compl., ¶ 17 (citing id, Ex. 1, Ex. A and Ex. B, §§ 7.2 (c), (e), (h); 8.1).
[30] Compl., ¶ 17.
[31] Compl., ¶¶ 19-22.
[32] Compl., ¶¶ 24-27.
[33] Compl., ¶ 27.

During further inspections, DSU personnel found additional problems, including the presence of black mold in several apartments. DSU hired an independent contractor, Environmental Testing, Inc. ("Environmental Testing"), to inspect the mold, evaluate healths risks therefrom, and recommend a remediation plan. Environmental Testing's report stated that the mold growth was attributable to water damage adjacent to HVAC air handling units and sinks in the affected apartments. The water damage adjacent to the HVAC units was the consequence of improper maintenance leading to excess condensation from the units' heat exchanger coils and refrigerant lines. Mold found behind the backsplash boards of sinks was the result of water damage due to improper sealing between those components. Environmental Testing recommended several specific steps for solving the mold problem and warned against "quick fixes" which would not remedy the underlying mold growth. DSU and the Foundation advised Ambling of the results of Environmental Testing's report and demanded Ambling immediately remediate the mold.[34]

Additional problems observed by DSU personnel included: many apartments having toilets, sinks, and/or appliances which did not work properly or were damaged or broken; visibly damaged drywall and carpets in obvious need of replacement; and failure to enforce the terms of individual leases (including non-DSU students–and one infant–living in the apartments as well as the presence of pets).[35] After discovering these additional problems, Mohammadi wrote an August 17, 2007 letter to Blackwell putting Ambling on Notice, as that term is defined in the Management Agreements, that

---

[34] Compl., ¶ 29-34.
[35] Compl., ¶ 35.

it was in default of the Agreements, as defined by Section 7.2(h). That letter identified specific examples of default, which conflicted with Ambling's obligation under Section 2.2 to successfully manage and operate the "Premises in a First Class Manner" and constituted waste of the Premises, in violation of Section 3.1(g).[36] It also advised that Ambling had not provided the Foundation with a required maintenance plan and was in further default of Article IV of the Agreements for failure to adequately administer its leasing duties.[37] The August 17, 2007 letter was a Notice of Default triggering a fifteen-day cure period during which Ambling was required to remedy the breaches identified therein.[38]

On August 22, 2007, Blackwell, answered via letter that promised to "honor all of [Ambling's] obligations under the management agreement."[39] In a letter of August 31, 2007, Mohammadi reiterated that Ambling was required to remedy all defects identified in his August 17, 2007, in both the Courtyard and the Village.[40] On September 4, 2007, the final day of the cure period, Blackwell wrote to the Foundation advising that "all items which [were] identified as defaults" have been "corrected, remedied and cured" by Ambling.[41]

On September 5, 2007, DSU personnel again inspected representative units of

---

[36] Compl., ¶¶ 36, 39. The instances of default identified (and supported by photographs of representative apartments) included: (1) Generally uninhabitable rental units; (2) Damaged and nonfunctioning appliances; (3) Damaged or nonfunctioning toilets and sinks; (4) Damaged drywall; (5) Damaged and fetid carpets; (6) Damaged and/or missing door jambs; (7) Unchanged A/C and heating air filters; (8) Mold on walls and floors in several units; (9) Infant living in at least one unit despite repeated prior notices; and (10) Other safety Issues. Compl., ¶¶ 37-38.
[37] Compl., ¶ 40.
[38] Compl., ¶ 41.
[39] Compl., ¶ 42.
[40] Compl., ¶ 43.
[41] Compl., ¶ 44.

the Courtyard and the Village and discovered that Ambling had not rectified the identified problems as it claimed. One remaining widespread problem was damaged outer doors on apartment units which did not close properly or securely. Several apartments still had inoperable or missing smoke detectors and/or panic buttons. Moreover, Ambling's attempted remediation of the mold problem was superficial and unsatisfactory as the root cause of the mold, improper maintenance of the HVAC units, was not addressed. Those HVAC units had not been cleaned and correct-sized filters were not installed. Additionally, the improperly sealed sinks and backsplash boards had not been repaired at all, nor had previously-identified broken toilets, sinks, showers, appliances, and drywall been repaired. Several apartments also still had carpeting and flooring that was filthy and fetid. During this inspection, several students complained that they and their parents had to clean their apartment and shampoo the carpets when they moved in because they were so filthy. Lastly, the leasing violations had not been remedied as non-DSU students were still living in some apartments and pets were still being kept.[42]

On September 12, 2007 Mohammadi wrote to Ambling advising it that the Foundation was terminating the Management Agreements, effective immediately, and that Ambling had until September 21, 2007 to vacate the premises. The Foundation immediately assumed responsibility for the maintenance and operation of the Courtyard and the Village Apartments, and began making necessary repairs.[43]

On September 13, 2007, the Foundation originally filed its complaint in Delaware

---

[42] Compl., ¶¶ 46-60.
[43] Compl., ¶¶ 63-65.

state court and Ambling removed the action to this court on October 5, 2007.

## III. DISCUSSION

### A. Count I – Declaratory Judgment

Court I seeks a declaration "that Ambling materially breached the Management Agreements by its failure to appropriately maintain the Premises, and that the Foundation was therefore within its rights to terminate the Management Agreements and Eject Ambling from the Premises."[44]

Ambling contends that the Foundation's request for declaratory judgment is "nothing more than an improper attempt to ask this Court for a declaration that [the Foundation's] past conduct was proper under the parties' agreements and that [Ambling's] conduct was not."[45] Ambling argues that the court should dismiss Count I because:

> (a) this declaratory judgment action serves no purpose where all of the factual and legal issues are before the Court as a result of [the Foundation's] claim for breach of contract and [Ambling's] counterclaim for breach of the same agreements; and (b) [the Foundation] has not plead, nor can [the Foundation] show, the requisite uncertainty or insecurity warranting declaratory relief where the contractual relationship at issue has terminated and all rights and damages have accrued.[46]

Ambling avers that the Foundation has terminated the Management Agreements; Ambling has vacated the properties; and Ambling has counter sued for breach of contract. Ambling argues, therefore, that there is no uncertainty or insecurity on the

---

[44] Compl., ¶ 70.
[45] D.I. 11 at 1.
[46] Id.

Foundation's part and, thus, declaratory relief serves no useful purpose.[47] The Foundation counters that Count I will serve a useful purpose in clarifying its obligations under the Management Agreement and notes that "the declaratory judgment statute is a proper vehicle for a party seeking the Court's interpretation of a written contract."[48] It contends that at the time the Complaint was filed it was uncertain concerning Ambling's response to the termination of the Management Agreements. The Foundation maintains that its request for declaratory judgment after it terminated Ambling, rather than prior to taking that action, should not deprive it of that remedy.

The federal Declaratory Judgment Act (the "Act") provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of the appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.[49]

"Whether to grant relief pursuant to section 2201 is vested in the court's discretion. 'Although the threat of legal action may present a real controversy . . . the remedy of a

---

[47] The Foundation contends that "[t]he facts alleged in [Ambling's] counterclaim are not properly considered in the context of a motion to dismiss [the Foundation's] complaint." D.I. 8 at 3 n.3 (citing Fed. R. Civ. P. 12(b)(6) and *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (stating "[g]enerally speaking," courts will not rely upon defenses to trigger dismissal of a complaint under Rule 12(b)(6))). The facts alleged in Ambling's counterclaim do not serve as the basis for the court's holding with regard to Ambling's motion to dismiss Count I.

[48] D.I. 8 at 9, 10.

[49] 28 U.S.C. § 2201(a). The Foundation's claim for declaratory judgment was brought pursuant to Delaware State law, 10 *Del. C.* § 6501 *et seq.*, however, as a result of Ambling's removal to federal court on the basis of diversity jurisdiction, the federal Declaratory Judgment Act controls. "An action for declaratory judgment is procedural in nature and purpose. A federal court exercising diversity jurisdiction follows federal procedural rules and, thus, federal law determines the rules to apply to a request for declaratory judgment relief in a given case." *Munich Welding, Inc. v. Great American Ins., Co.*, 415 F. Supp. 2d 571, 574 (2006) (citing *Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 352 (3d Cir. 1986) (noting that "it is settled law that, as a procedural remedy, the federal rules respecting declaratory judgment apply in diversity cases")).

declaratory judgment is discretionary even where a justiciable controversy exists.'"[50] A court should not grant declaratory relief "'if it finds that a declaratory judgment action will not serve a useful purpose or is otherwise undesirable.'"[51] In making its determination as to whether declaratory relief should be granted, the court "'must ask whether the requested declaratory judgment will (1) clarify and settle legal relations in issue and (2) terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action.'"[52] The court determines that declaratory relief is not warranted.

Declaratory judgment permits parties to avoid the "accrual of avoidable damages to one not certain of his rights" and "would . . . strongly affect present behavior, have present consequences and resolve a present dispute."[53] "A declaratory judgment is inappropriate solely to adjudicate past conduct."[54] "'The real value of the judicial pronouncement . . . is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*'"[55] Here, the Foundation seeks, through declaratory

---

[50] *Gruntal & Co., Inc. v. Steinberg*, 837 F. Supp. 85, 89 (D.N.J. 1993) (quoting *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1170 (3d Cir. 1987)). The Foundation states that it "does not quarrel with the concept that, under the Federal Declaratory Judgment Act, the remedy of a declaratory judgment is discretionary." D.I. 8 at 9. Regardless, the discretionary nature of the court's consideration of Count I is the same even if analyzed under 10 *Del. C.* § 6501, *et. seq. See Burris v. Cross*, 583 A.2d 1364, 1372 (Del. Super. 1990) ("The decision to entertain an action for declaratory judgment is discretionary with a trial court, the only limitation being that the Court cannot abuse its discretion.") (citations omitted).

[51] *Gruntal*, 837 F. Supp. at 89 (quoting *United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 216 (D. Del. 1991)).

[52] *Id.*

[53] *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 823 (3d Cir. 1981) (citations omitted).

[54] *Gruntal*, 837 F. Supp. at 89 (citing *Crown Cork & Seal Co., Inv. v. Borden, Inc.*, 779 F. Supp. 33, 35 (E.D. Pa. 1991); *see also Alpine Group, Inc. v. Johnson*, No. 01 Civ. 5532 (NRB), 2002 WL 10495, at *4 (S.D.N.Y. Jan. 3, 2002) (The court dismissed plaintiff's declaratory judgment claim because, *inter alia*, "Plaintiff's claim . . . runs counter to the purposes underlying the DJA. The Act was designed to enable parties to clarify their rights *before they acted*. Here, however, plaintiff has already terminated Johnson, and now it seeks declaratory relief stating that its action was proper.") (citation omitted) (emphasis added).

[55] *Gruntal*, 837 F. Supp. at 89 (quoting *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988)) (emphasis in original).

relief, adjudication of that its past conduct, i.e., termination of the Management Agreements and ejection of Ambling from the properties, was proper. The parties' potential damages resulting from any breach of those contracts is fixed; the parties' behavior with respect to their respective obligations will not be affected; no accrual of avoidable damages will be avoided by the relief sought.

Although the Foundation is correct that declaratory judgment may be sought in order for the court to interpret a written contract, the cases cited in support of its opposition concerned contractual relationships in which declaratory relief could affect the then-present behavior of the contracting parties. In *Burger King Corp. v. Family Dining, Inc.*,[56] the plaintiff sought declaratory judgment that "a contract between the parties, by its own terms, is no longer of any force and effect."[57] The court stated that "[a] request for declaratory relief is appropriate *in a case such as this* where the primary question is whether . . . a [contract] termination has occurred."[58] There, the plaintiff was uncertain of its rights and sought a declaration that the actions of the defendant resulted in termination of the contract at issue. Here, the Foundation terminated the Management Agreements prior to seeking declaratory relief.

Likewise, *Clemente v. Greyhound Corp.* involved plaintiffs seeking declaratory judgment concerning defendant's rights and obligations under a contract that had not been terminated, as well as, whether there had been a total breach by defendant of its

---

[56] 426 F. Supp. 485 (E.D. Pa. 1997), *aff'd without opn*, 566 F.2d 1168 (3d Cir. 1997) (Table).
[57] *Id.* at 487.
[58] *Id.* The court ultimately determined that the plaintiff was not entitled to a declaration that the contract at issue was terminated and granted plaintiff's Rule 41(b) motion for an involuntary dismissal. *Id.* at 495

contractual relationship with plaintiffs.[59] In denying defendant's motion to dismiss, the *Clemente* court stated the complaint at issue "alleges matters which render the statute most suitable."[60] There, declaratory relief resolving the parties' obligations under the contract could affect their present behavior and have present consequences. The court noted, for instance that if the defendant had "misconstrued the contract and is acting wrongfully thereunder, it may decide to comply with the contract for the balance of the contract term. It may agree to settle its differences in an amicable fashion rather than being forced to a determination of the liability on its breach."[61] If the court determined that the contract was breached and defendant "returns to performance under the contract . . . [the defendant] might decide to renew its contract, with or without certain modifications, for a subsequent term" after the expiration of the current contract.[62] Again, here there is no present behavior on the part of Ambling to affect as its contracts with the Foundation have been terminated.[63]

The court declines to exercise its discretion to grant declaratory relief in this case. This decision will not deprive the Foundation of the ultimate remedy sought by its

---

[59] 155 A.2d 316, 319-20 (Del. Super. 1959).
[60] *Id.* at 321.
[61] *Id.*
[62] *Id.*
[63] The Foundation also cites *Johnson v. GEICO Cas. Co.*, 516 F. Supp. 2d 351 (D. Del. 2007). *Johnson* involved plaintiffs bringing several claims, including a request for declaratory judgment, against insurance companies alleging improper delay or denial of benefits under plaintiffs' policies. Plaintiffs sought a declaratory judgment that defendants breached their contracts with the plaintiff policy holders. Defendants sought dismissal of the declaratory judgment claim because it was purportedly subsumed within plaintiffs' other claims. *Id.* at 357. The Court acknowledged "that there may be some overlap between Plaintiffs' substantive claims and their declaratory judgment claims. At this juncture, however, Plaintiffs remaining claims have not been fully developed, and therefore, the Court cannot fully evaluate the extent of the overlap so as to determine whether declaratory judgment would serve no useful purpose in clarifying the legal rights and relationships at issue." *Id.* In *Johnson*, the parties' respective rights and obligations remained unclear and the insurance contracts at issue do not appear to have been terminated. Here, the Foundation has terminated the Management Agreements and a determination of the propriety of that termination will be resolved through its breach of contract claim.

request for declaratory judgment, a determination of whether Ambling breached the Management Agreements, as that question will be answered with the resolution of its breach of contract claim which is not the subject of this motion. Consequently, Ambling's motion to dismiss Count I is granted.

### B.   Count III – Tortious Interference with Business Relations

Count III alleges:

> 76.   The Foundation maintains the Courtyard and the Village apartments for the benefit of DSU students, with whom they have a contractual relationship to provide, safe, clean, and appropriate housing.
>
> 77.   Ambling's intentional failure to fulfill its obligations under the Management Agreements has adversely interfered with the Foundation's relationship with the DSU students whom it serves.
>
> 78.   Ambling's breach fo the Management Agreements is the proximate cause of the damage the Foundation has sustained to its relationship with DSU students.
>
> 79.   As a result of Ambling's intentional interference, the Foundation has suffered undetermined damages to its reputation.[64]

The Complaint further alleges that students complained about the condition of their apartments: "During their inspection on September 5, 2007, DSU personnel encountered several students who complained that they and their parents had to clean their apartment and shampoo the carpets when they moved in because they were so filthy."[65]

"Delaware Courts follow the definition of tortious interference with advantageous

---

[64] Compl., ¶¶ 76-79.
[65] Compl., ¶ 56.

14

Case 1:07-cv-00610-MPT   Document 42   Filed 06/04/08   Page 15 of 18 PageID #: 468

relationships found in the Second Restatement."[66] "Tortious interference with advantageous relationship encompasses two torts: tortious interference with contract and tortious interference with prospective contractual relations."[67] In its opening brief, Ambling stated that it was unable to determine which tortious interference tort was being alleged and included arguments for dismissal addressing each. In its opposition brief, the Foundation addresses the elements of tortious interference with prospective contractual relations, arguing that the complaint sufficiently alleges that claim and dismissal is improper.[68]

"The elements of tortious interference with prospective contractual relations includes '(1) the existence of a valid business relation or expectancy, (2) the interfere's knowledge of the relationship or expectancy, (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted.'"[69]

Ambling argues that, even accepting the allegations in the Complaint as true, it fails to adequately plead facts or state a claim for tortious interference with prospective contractual relations. Ambling contends that "(1) [the Foundation] failed to adequately plead termination of a relationship or expectancy; (2) [the Foundation] failed to adequately plead an act of intentional interference by Ambling; and (3) [the Foundation]

---

[66] *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983 (Del. Ch. 1987)).

[67] *Corning Inc.*, 292 F. Supp. 2d at 585 (citing Restatement (Second) of Torts Div. 9 (1979)).

[68] See D.I. 8 at 11-14; *id.* at 12 ("[I]t is not necessary for a claim of tortious interference with prospective business relations to allege an underlying breach of contract."); *id.* at 14 (The Foundation's claim is for intentional interference with *prospective* business relations . . . .") (emphasis in original).

[69] *Corning Inc.*, 292 F. Supp. 2d at 585 (citing *In re Frederick's of Hollywood, Inc.*, 1998 WL 398244, *5 (Del. Ch. 1998)).

failed to adequately plead resulting damages."[70] Ambling also argues that it could not interfere with the Foundation's relationship with DSU students because it was not a stranger to the business relationship with which it is accused of interfering.

With respect to the "intentional interference" element, Ambling argues that the Complaint does not plead any intentional or wrongful conduct other than the alleged breach of the Management Agreements. Citing paragraph 77 of the Complaint, Ambling states that the Foundation only alleges that Ambling's "intentional failure to fulfill its obligations under the Management Agreements" adversely interferes with the Foundation's relationships with DSU student renters. Ambling contends that the Foundation's failure to reference any other independent act in the Complaint is fatal to Count III because the tort of intentional interference requires a wrong act other than the breach of contract.

> Under Delaware law, a plaintiff bringing an claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort. In preventing gratuitous 'bootstrapping' of contract claims into tort claims, courts recognize that a breach of contract will not generally constitute a tort. Even an intentional, knowing, wanton, or malicious action by the defendant will not support a tort claim if the plaintiff cannot assert wrongful conduct beyond the breach of contract itself. Rather, a tort usually involves violation of a duty which arises 'by operation of law and not by the mere agreement of the parties.' However, the same circumstances may give rise to both breach of contract and tort claims if the plaintiff asserts that the alleged contractual breach was accompanied by the breach of an independent duty imposed by law.[71]

---

[70] D.I. 14 at 3. Implicit in Ambling's argument is an acknowledgment that the first two elements of the tort are adequately pled: (1) the existence of a valid business relation or expectancy and (2) Ambling's knowledge of the relationship or expectancy.

[71] *Data Management Internationale, Inc. v. Saraga*, C.A. No. 05C-05-108, 2007 WL 2142848 (Del. Super. July 25, 2007) (footnotes omitted). The Foundation argues that Ambling's reliance on opinions, such as *Data Management*, decided in the context of summary judgment is inappropriate. *See* D.I. 8 at 12-13 (citing *Enzo Life Sciences, Inc. v. Digene corp.*, 292 F. supp. 2d 424, 429 (D. Del. 2003) (noting that cases decided under summary judgment standard do not provide guidance when deciding a motion to dismiss)). Ambling counters, and the court agrees, that it merely relies on *Data Management* setting out the applicable requirements under Delaware law for the intentional interference cause of action. *See* D.I.

In *Data Management*, the defendant argued that a conversion claim was not independent of the plaintiff's breach of contract claims. The court rejected that argument finding that the conversion claim "alleged a breach of a tort duty existing independent of the defendants's contractual obligations."[72] The Foundation contends the same is true in this case: "Ambling had a duty, independent of its contractual obligations to the Foundations, to refrain from actions that would damage the Foundation's reputation with DSU's students."[73] The court disagrees with the Foundation's contention. In rejecting the defendant's argument in *Data Management*, that court distinguished the facts before it from a case in which it was determined that the duty asserted as the basis for a fraud claim "arose solely from the contract. *Pinkert* stands in contrast to the instant case, in which the plaintiff raises a tort claim based upon an alleged violation of a duty which exists *independent of the contract* between the parties."[74]

Here, the court determines that the Foundation's tortious interference claim is not independent of the Management Agreements, and arises solely therefrom. As recited above, Count III alleges that "Ambling's intentional failure to fulfill its obligations under the Management Agreements adversely interfered with the Foundation's relationship with the DSU students . . . [and] Ambling's breach of the Management Agreements is the proximate cause of the damage" sustained by the Foundation.[75] As

---

14 at 5.

[72] *Data Management*, 2007 WL 2142848, at *4.

[73] D.I. 8 at 13.

[74] *Data Management*, 2007 WL 2142848, at *4 (emphasis added) (distinguishing *Pinkert v. John J. Olivieri, P.A.*, No. Civ. A. 99-380-SLR, 2001 WL 641737 (D. Del. May 24, 2001)).

[75] Compl., ¶¶ 77-78.

such, the court finds that Count III is an improper bootstrapping of the Foundation's breach of contract claim (Count II) into its tortious interference claim.[76] Consequently, Ambling's motion to dismiss Count III is granted.

## IV.   CONCLUSION

For the reasons stated above:

It is ORDERED AND ADJUDGED that Ambling's motion to dismiss Count I and Count III of the Foundation's Complaint (D.I. 4) is **GRANTED**.

June 4, 2008
Wilmington, Delaware

_____
UNITED STATES MAGISTRATE JUDGE

---

[76] As a result of this determination, the court need not address the parties' arguments concerning the other elements of a tortious interference claim.

18